**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**
_____

Richard H. Davis,

                    Plaintiff,


v.                                    **MEMORANDUM OF LAW AND ORDER**
                                      **Civil File No. 03-06081(MJD/RLE)**


Boise Cascade Corporation,
and Quay Whitbeck,

                    Defendants.
_____

Richard Thompson Wylie, Wylie Law Office, Counsel for Plaintiff.

John H. Harper III and Terrance J. Wagener, Krass Monroe, PA, Counsel for
Defendants.
_____

## I.    INTRODUCTION

        This is a Family Medial Leave Act ("FMLA") case arising out of Plaintiff's

termination of employment for excessive absenteeism. This matter is before the

Court on Defendants Boise Cascade and Quay Whitbeck's Motion for Summary

Judgment [Docket No. 51]. Oral argument was heard on May 25, 2005. For the

following reasons, Defendants' Motion is granted in part and denied in part.

## II.   FACTUAL BACKGROUND

        Plaintiff Richard H. Davis worked for Defendant Boise Cascade Corporation

("Boise") for twenty-six years, and Defendant Quay Whitbeck was a Boise

supervisor. At the time this dispute arose, Plaintiff was a will sheet operator at Boise. In this position, Plaintiff operated a machine that cut paper into reams.

Plaintiff was terminated for unscheduled absences due to abscessed teeth. Prior to having the tooth problems, Plaintiff missed eight days of work for unscheduled absences over a twelve month period. Plaintiff received a written warning on January 14, 2001.  The warning stated that any further unexcused absences would "result in progressive corrective action, which from this stage could be a Last Chance Agreement."  After receiving this warning, Plaintiff had further absences.

In lieu of termination, Plaintiff signed a Last Chance Agreement ("LCA"), dated May 15, 2001, which prohibited any work absences for six months. The LCA stated that it was being implemented because Plaintiff had "missed another scheduled day of work."[1] Plaintiff testified that he reviewed the LCA before he signed it, and that he understood the contents of it at that time. (Davis Dep. at 22.)

Notwithstanding the LCA, Plaintiff left work on Sunday, October 21, 2001 because he was suffering so much with an abscessed tooth that he could not continue to work. (Id. at 29.)  Plaintiff was working the 6:00 a.m. to 6:00 p.m.

_____

[1]As discussed in Part III.B., infra, Plaintiff argues that the LCA was implemented on illegitimate grounds.

shift that day, and left at about 2:45 p.m. (Id. at 28.) At the time, Plaintiff

discussed leaving early with his supervisor, Ms. White. White told Plaintiff that she

did not understand how the LCA worked, but "if you have to go home, we'll move

somebody up." (Id. at 29.)  There is conflicting testimony regarding whether

White informed Plaintiff that his job could be in jeopardy if Plaintiff left work

early.  Plaintiff does not recall if White said anything, but White testified that she

informed Plaintiff that leaving early could jeopardize his employment. (Id. at 30-

31; White Dep. at 4.)  In his opposition papers, Plaintiff stated that he felt he was

"authorized to leave" once Ms. White found a replacement worker. However, in

his deposition, Plaintiff admitted that he knew leaving early on October 21

violated the LCA. (Davis Dep. at 61.)

Plaintiff went home and rested for the remainder of the day.  The next day,

Monday, October 22, was Plaintiff's regularly scheduled day off. On that day,

Plaintiff saw Jeffrey Buchholz, D.D.S.  Dr. Buchholz identified the problem tooth

as "number 14," and wanted to extract the tooth.  However, Dr. Buchholz was

unable to do so because he could not sufficiently numb the area. (Buchholz Dep.

at 17-18.)  Dr. Buchholz prescribed Plaintiff an antibiotic and Tylenol 3, and

scheduled Plaintiff for another appointment on October 25. Dr. Buchholz testified

that when he prescribed the medication, he likely warned Plaintiff to "be careful

. . . operating heavy equipment," and to "keep . . . [away] from any dangers,"

3

because this is his usual practice. (Id. at 8-9.) Dr. Buchholz did not write Plaintiff a note to be off work. (Id. at 8-9, 43.) Plaintiff was able to drive himself home, and the medication apparently provided some relief because Plaintiff worked his full shifts on October 23 and 24.  While working, Plaintiff only took the antibiotics, and did not take the Tylenol 3.

Plaintiff received permission from his supervisor, Defendant Quay Whitbeck, to miss work on the evening of October 25 to recover from having his tooth extracted that morning. However, at the 8:30 a.m. appointment, Dr. Buchholz was again unable to numb Plaintiff's mouth sufficiently to perform the procedure.  Dr. Buchholz then referred Plaintiff to Dr. Cornell, an oral surgeon located in Duluth. At 10:00 a.m. on October 25, Whitbeck called Plaintiff at home and told him to bring in a note from the dentist verifying his condition. Plaintiff informed Whitbeck that he was already done with the dentist for the day, that he would be in to work his regular shift that night, and that he was now scheduled for oral surgery in Duluth. Plaintiff testified that although he just "lounged" for the rest of the day after his dentist appointment, he could have carried out his normal activities had he chosen to do so. (Davis Dep. at 42.) At approximately 3:00 p.m. on that day, Whitbeck called Plaintiff again, and told Plaintiff that he was being suspended for leaving work early on October 21 in violation of the LCA.

On October 29, Plaintiff and his union representative met with Defendants'

representatives concerning Plaintiff's suspension. At this meeting, Plaintiff's union

steward claimed that the October 21 absence was covered by the FMLA. In spite

of this, Plaintiff was terminated. Plaintiff's union did not pursue the matter with

Boise. On November 2, 2001, Plaintiff had three abscessed teeth removed by Dr.

Cornell. Plaintiff was under general anesthesia during the extractions.

Dr. Cornell's records indicate that the extractions "went very well," took

about eleven minutes, and involved no complications. (Cornell Dep. at 15.)

Plaintiff testified that prior to the surgery, he finished taking all of the antibiotics

Dr. Buchholz had prescribed, but that he cannot remember if the antibiotics lasted

past October 29. (Davis Dep. at 56, 69.) Plaintiff stated that from the time of the

surgery on November 2 through the morning of November 6, he was dizzy from

his medication and was able to do very little of his normal activities, reducing his

activities to resting; watching television; attending to his wood furnace only twice

a day, and with difficulty; and making and eating only soup rather than a normal

varied diet. (Davis Decl. at 3-6.) Plaintiff testified that during this time, his pain

rated from a three to an eight on a ten point scale, and that he was dizzy from the

painkillers so that walking downstairs to tend the wood furnace was difficult and

required him to hang onto both the railing and the wall. (Davis Dep. at 72-81;

Davis Decl. ¶ 15.) During this time, Plaintiff took the pain medication prescribed

by Dr. Cornell. Plaintiff did not get the prescription filled until November 3, and

finished all the medication on Tuesday November 6. Plaintiff testified that on the afternoon of November 6, he finally "[got] back to normal." (Id. ¶ 11; Davis Dep. at 80-81.)

One month after his surgery, Plaintiff asked Dr. Cornell to complete an FMLA certification form on his behalf. (Cornell Dep. Ex. 4.) In that form, Dr. Cornell stated that Plaintiff was unable to work November 2-4, 2001, which included the day of the surgery and two days following surgery. (Id. at 1.) Dr. Cornell testified that the three day recommendation resulted from a two day recuperation in addition to taking the day of surgery off work. Dr. Cornell always has his patients take the day of surgery off because patients might expose themselves to food or drink in the workplace that would complicate the use of anesthesia during surgery. (Cornell Dep. at 20.) Dr. Cornell also stated that Plaintiff's dental problems were not routine insofar as the teeth required surgical extraction rather than simple extraction because the crowns of the infected teeth were missing from decay and the infection had progressed to a point where local anesthesia was ineffective. (Id. at 2, 28-30.) Dr. Cornell further testified that Plaintiff's condition would have likely resulted in incapacitation for more than three days, and even hospitalization, if left untreated. (Id. at 27, 37; Wylie Decl. Ex. H at 2.)

Plaintiff filed the instant lawsuit on October 16, 2003 in Koochiching

County District Court.  Defendants removed the case to Federal Court.  Plaintiff's

Amended Complaint asserts that Defendants violated the FMLA by (1)using

Plaintiff's October 21 absence as a negative factor in discharging him; (2) denying

Plaintiff an excused absence on October 21; (3) refusing to restore Plaintiff to his

position after his October 21 absence; (4) failing to notify Plaintiff of his rights

under the FMLA; and (5) suspending and discharging Plaintiff for exercising his

rights under the FMLA. (Compl. ¶ 19.) Defendants filed the instant motion for

summary judgment on April 11,2005.

## III.    DISCUSSION

### A.    Summary Judgment Standard

Summary judgment is appropriate if, viewing all facts in the light most

favorable to the non-moving party, there is no genuine issue as to any material

fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ.

P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The party seeking

summary judgment bears the burden of showing that there is no disputed issue of

material fact. Id. at 323.  Summary judgment must be granted when the opposing

party fails to make a showing that supports the existence of an element essential

to the case and on which the opposing party bears the burden of proof at trial. Id.

at 232-33. When there is a complete failure of proof concerning an essential

element of the opposing party's case, there can be no genuine issue of material

fact, since all other facts are rendered immaterial.  Id. Whether a plaintiff has a

serious health condition for purposes of the FMLA is a mixed question of law and

fact. Thorson v. Gemini, Inc., 205 F.3d 370, 377 (8th Cir. 2000).

**B.    The Family Medical Leave Act of 1993**

The Family Medical Leave Act of 1993 ("FMLA") was enacted to allow

employees to take reasonable leave for medical reasons. 29 U.S.C. § 2601. Under

the FMLA, an eligible employee is entitled to a total of twelve weeks of leave

during any twelve month period because of a serious health condition that makes

the employee unable to perform the functions of his job. 29 U.S.C. § 2612(D). The

FMLA defines a "serious health condition" as an "illness, injury, impairment, or

physical or mental condition that involves . . . continuing treatment by a health

care provider." 29 U.S.C. § 2611(11)(B).  The Department of Labor has issued

regulations further defining a "serious health condition."  The C.F.R. provides, in

pertinent part:

> (a)     For purposes of FMLA, "serious health condition"
> entitling an employee to FMLA leave means an illness, injury,
> impairment, or physical or mental condition that involves:
>  (1) Inpatient care . . . or
>  (2) Continuing treatment by a health care provider. A serious
> health condition involving continuing treatment by a health
> care provider includes any one or more of the following:
>> (i) A period of incapacity (i.e., inability to work,
>>  attend school or perform other regular daily
>>   activities due to the serious health condition,
>>  treatment therefor, or recovery therefrom) of more

than three consecutive calendar days, and any
subsequent treatment or period of incapacity
relating to the same condition, that also involves:

    (A)    Treatment two or more times by a health
care provider . . . or

    (B)    Treatment by a health care provider on at
least one occasion which results in a

regimen of continuing treatment under the
supervision of the health care provider [or]

.   .   .

(v) Any period of absence to receive multiple treatments
(including any period of recovery therefrom) by a health
care provider . . . for a condition that would likely result
in a period of incapacity of more than three
consecutive calendar days in the absence of medical
intervention or treatment, such as cancer
(chemotherapy, radiation, etc.), severe arthritis (physical
therapy), kidney disease (dialysis).

(b) Treatment for purposes of paragraph (a) of this section includes
(but is not limited to) examinations to determine if a serious health
condition exists and evaluations of the condition. Treatment does not
include routine physical examinations, eye examinations, or dental
examinations. Under paragraph (a)(2)(i)(B), a regimen of continuing
treatment includes, for example, a course of prescription medication
(e.g., an antibiotic) or therapy requiring special equipment to resolve
or alleviate the health condition (e.g., oxygen).

(c) . . . Ordinarily, unless complications arise, the common cold, the
flu, ear aches, upset stomach, minor ulcers, headaches other than
migraine, routine dental or orthodontia problems, periodontal
disease, etc., are examples of conditions that do not meet the
definition of a serious health condition and do not qualify for FMLA
leave.

29 C.F.R. § 825.114(a)-(c).  The FMLA is not designed to cover short term

conditions for which the treatment and recovery are very brief.  However, even

9

normally minor illnesses can be serious health conditions if they satisfy the regulatory tests for serious conditions. See Thorson, 205 F.3d at 378-79 (quoting Dec. 12, 1996 Dept. of Labor Op. Letter)(finding flu-like symptoms a serious health condition because plaintiff was incapacitated for more than three consecutive days and sought continuing treatment twice).

It is illegal for an employer to deny or interfere with an employee's substantive FMLA rights. 29 U.S.C. § 2615(a)(1). It is also illegal for an employer to retaliate against an employee who exercises his rights under the FMLA. 29 U.S.C. § 2615(a)(2). In the instant case, Plaintiff has pled both interference and retaliation claims.

### C.    Plaintiff's Interference Claims

Plaintiff claims that his October 21 absence was due to a serious health condition under the FMLA and therefore Defendants were not entitled to use his October 21 absence as a negative factor against him. Defendants respond that Plaintiff's October 21 toothache was not a serious health condition under the FMLA, and therefore Plaintiff's absence on that day violated the LCA. Thus, Defendants argue they were justified in terminating Plaintiff's employment.

### Whether Plaintiff's October 21 Toothache was a "Serious Health Condition" Under the FMLA

If an absence is not attributable to a serious health condition, the FMLA is

not implicated, and the employee is not protected against disciplinary action
based on such absences. Bailey v. Amsted Indus., Inc., 172 F.3d 1041, 1045-46
(8th Cir. 1999).  However, "[a]n employer is prohibited from discriminating
against employees or prospective employees who have used FMLA leave. . . .
[and] cannot use the taking of FMLA leave as a negative factor in employment
actions, such as hiring, promotions or disciplinary actions; nor can FMLA leave be
counted under 'no fault' attendance policies."  29 C.F.R. § 825.220(c).  In
addition, an employer cannot avoid liability under the FMLA by discharging an
employee who takes leave in order to seek treatment for a condition that is later
determined to be covered by the FMLA. Caldwell v. Holland of Texas, Inc., 208
F.3d 671, 677 (8th Cir. 2000). "The employer who precipitously fires an employee,
when the latter claims the benefits of leave under the FMLA, bears the risk that
the health condition in question later develops into a serious health condition
within the meaning of 29 C.F.R. § 825.114(a)." Id.

     In the instant case, Plaintiff was not an inpatient.  Thus, to establish a
"serious health condition," Plaintiff must produce objective evidence of the
following: (1) a period of incapacity requiring absence from work; (2) the period
of incapacity exceeds three days; and (3) proof that the employee received
continuing treatment by a health care provider within the period. Thorson, 205
F.3d at 377.

The Eighth Circuit recognizes that illness does not always act in predictable ways, and that it is important to look at a disease over the "entire period of illness." Caldwell, 208 F.3d at 676. The Caldwell court reasoned that:

> as long as [plaintiff] satisfie[s], at some point in time, the "more than three consecutive days" requirement for establishing a serious health condition, his intermittent absences for less than four days . . . [are] protected under the FMLA if they were necessary "to determine if a serious health condition exists" . . . or to treat such a condition. This is true even if the intermittent absences occurred before the consecutive absences.

Id. (quoting Hodgens v. General Dynamics Corp., 144 F.3d 151, 163 (1st Cir. 1998)) (finding that plaintiff raised a fact question as to whether her one day absence was related to her son's on-going serious ear infection that eventually required surgical intervention) (ellipses in original). See also Stekloff v. St. John's Mercy Health Sys., 218 F.3d 858, 863 (8th Cir. 2000) (finding that there is no requirement that an employee be diagnosed with a serious health condition before becoming eligible for FMLA leave).

Neither the Eighth Circuit nor any district courts within the Eighth Circuit have addressed whether a toothache is a serious health condition under the FMLA. Defendants cite several cases from other jurisdictions in which the courts found that toothaches are not serious health conditions. See Bond v. Abbott Labs., 7 F. Supp.2d 967, 975 (N.D. Ohio 1998) (finding that emergency tooth extractions

because of infection from "severe bone loss and decayed teeth" were routine and not covered by the FMLA); <u>Flanagan v. Keller Prod.,Inc.</u>, Civ. NO. 00-542-M, 2002 DNH 047, 2002 WL 313138, at ** 5-6 (D.N.H. Feb. 25, 2002) (unpublished opinion)(finding that a dental condition that lasted for a month and required seven separate visits to the dentist did not qualify as a serious health condition even though plaintiff was sent home from work once for pain and side effects from medication made her too sick to work one day); <u>Ducharme v. Cape Indus., Inc.</u>, No. 01-74503, 2002 WL 31545980, at *2 (E.D. Mich. Oct. 8, 2002) (unpublished opinion)(finding tooth extraction routine and not related to prior gum disease and recurring tooth abscesses that previously qualified as a serious health condition under the FMLA); <u>Brown v. Seven Seventeen HB Philadelphia Corp. No. 2A Adam's Mark Hotel</u>, No. 01-1741, 2002 WL 31421924, at ** 4-5 (E.D. Pa. Aug. 8, 2002)(unpublished opinion)(finding toothache requiring antibiotics and extraction not a serious health condition).

Plaintiff argues that his toothache qualifies as an "incapacity plus multiple treatments" under 29 C.F.R. § 825.114(a)(2)(i)(A). Plaintiff points to his two appointments with Dr. Buchholz on October 22 and 25, 2001 and his extractions and recuperation on November 2-6, 2001 as evidence of multiple treatments. Plaintiff also avers that his condition was an "incapacity plus regimen" under 29 C.F.R. § 825.114(a)(2)(i)(B) because he was incapacitated for more than three

consecutive days for his oral surgery and recovery, and he also received treatment from a health care provider on at least one occasion that resulted in a "regimen of continuing treatment under the supervision of the provider."

Defendants assert that even if the Court were to consider the November 2-4 restrictions Dr. Cornell imposed, Plaintiff has not met his burden.  First, according to Defendants, Dr. Cornell's excuse does not provide a basis for incapacity for all of November 2, 2001.  Defendants argue that Dr. Cornell's reasoning is flawed because Plaintiff could just as easily eat and drink at home as at work.  Plaintiff's November 2 appointment was at 2:00 p.m. Thus, according to Defendants, at most Dr. Cornell only limited Plaintiff's activities for two and one-half days.

Defendants also argue that Plaintiff's relatively healthy period from October 22 to November 2, 2001 "breaks the chain" and renders Plaintiff's October 21 absence not related to an illness that lasted more than three consecutive days. Defendants aver that Plaintiff's admitted ability to engage in his normal routine from October 22 through November 2 proves that any incapacity Plaintiff suffered after surgery cannot be tied to the October 21 illness. Plaintiff counters that he actually did not resume normal activities until Tuesday, November 6, 2001, and thus he was incapacitated for four days in November. Moreover, Plaintiff was receiving continuing antibiotic treatment from October 22 to November 1, 2001.

14

**1.     Whether Plaintiff suffered a period of incapacity of more than three days and received subsequent treatment pursuant to 29 C.F.R. § (a)(2)(i)**

It is undisputed that Plaintiff's initial period of incapacity lasted only one day, October 21.  Plaintiff testified that he was able to maintain a regular routine on October 22, and Plaintiff attended work on October 23 and 24, thus precluding a finding of an "inability to work" based on October absences. However, Plaintiff's October 21 absence is arguably tied to a three day period of incapacity commencing November 2, 2001.

**a.     "More than three day" Prong**

Plaintiff's situation is somewhat similar to the plaintiff's situation in Caldwell. In that case, plaintiff Juanita Caldwell took Saturday, June 7 off work to care for her son, Kejuan, who had a severe ear infection.  Caldwell, 208 F.3d at 673. On that day, Caldwell took Kejuan to the clinic, and the doctor prescribed antibiotics and a decongestant. Id.  The doctor told Caldwell that Kejuan's condition would require surgery if the child was to avoid hearing loss. Id. Later that night, Caldwell actually worked a shift at another restaurant owned by her employer. Id. Caldwell's mother watched Kejuan while Caldwell worked this shift. Id. Caldwell was not scheduled to work on Sunday, but when she arrived for work on Monday, she was fired. Id.

Caldwell and her mother asserted that Kejuan suffered incapacity for more

15

than three consecutive days following his first trip to the clinic because the boy could not participate in his regular activities, remained in the house, and was kept in bed as much as possible for ten days. <u>Id.</u> During this time, Kejuan took his prescribed medications. <u>Id.</u>  Kejuan had a follow-up appointment on July 1, and was again prescribed medications for a "persistent ear infection." <u>Id.</u> Kejuan was again limited in his activities during this time. On July 17, Kejuan had surgery to remove his adenoids and tonsils, and put tubes in his ears. <u>Id.</u> Following the surgery, Kejuan was prescribed more antibiotics, and was ordered to stay in bed for a week. <u>Id.</u> During his recuperation, Caldwell and her mother keep Kejuan inside and restricted his activities. <u>Id.</u>

The Eighth Circuit found that Caldwell had presented sufficient evidence to raise a fact question as to whether Kejuan was incapacitated for more than three days. <u>Id.</u> at 674. The court relied on Caldwell's affidavit and Kejuan's medical records which showed that Kejuan's ear infection was "a continuing, persistent condition that could only be treated by surgery." <u>Id.</u> at 675.  The court found that Kejuan's period of incapacity could be measured over the "entire time during which he was suffering from this illness and being treated for it." <u>Id.</u>  The court noted that Kejuan was receiving medications for the entire period from June 7-July 17, and that Kejuan's condition persisted until his July 17 surgery. <u>Id.</u>

The court further reasoned that even if Kejuan was not incapacitated prior

16

to his surgery, he was clearly incapacitated for more than three days after his surgery. Id. at 675-76. The court noted that the surgery was the "necessary and only" treatment for Kejuan's ear infection. Id. at 676. The court relied on cases from the First and Seventh Circuits which allow the following to qualify for FMLA leave: (1) "intermittent leave" of less than four days for the purpose of diagnosing serious health conditions which eventually result in incapacity for more than three consecutive days, "even if the intermittent absences occurred before the consecutive absences," and (2) multiple illnesses, if temporally linked. Id. (citations omitted). Thus, the court concluded that Caldwell had at least created a fact question as to whether Kejuan's ear infection was a serious health condition under the FMLA. Id.

Plaintiff's situation is somewhat similar to Caldwell's situation. Like Kejuan, Plaintiff was suffering from a condition that could only be treated by surgery. There is no dispute that Plaintiff, like Kejuan, took medications from the time of his first doctor's visit until at least three days before his surgery. In addition, even though Plaintiff was able to work on October 23-24, Plaintiff may be able to satisfy the "more than three day incapacity" prong of the test if he was incapacitated for more than three days after his surgery. Even if the Dr. Cornell's certificate only established a two and one half day period of incapacity, Plaintiff has proffered evidence that creates a fact question as to whether that period was extended until

17

the afternoon of November 6, 2001.  This would result in a four day period of incapacity.

Moreover, Dr. Cornell testified that although he filled out an FMLA form stating that Plaintiff could not work from November 2-4, he does not like his patients to work during the entire time they are on pain medication following surgery. (Cornell Dep. at 22.) Plaintiff stated that he took pain medication until November 6. In addition, Dr. Cornell stated that his FMLA note indicated the "minimum time" he would recommend someone being off work. (Id. at 21.) Thus, Plaintiff has raised a fact question as to whether he was incapacitated for more than three days and whether his October 21 absence was tied to a more than three day period of incapacity.

### b.    "Treatment" Prong

The Court also finds that Plaintiff has raised a fact question as to whether he satisfies the subsequent treatment prong of 28 C.F.R. § 825.114(a). First, Plaintiff was seen by dentists three times from October 22 to November 2.  This may satisfy prong (2)(i)(A), the "multiple treatment prong." Although routine dental examinations do not normally satisfy this prong, 28 C.F.R. §825.114(b), Plaintiff's two attempts at extraction and eventual trip to the oral surgeon may not have been routine. Dr. Cornell stated that Plaintiff's extractions were not routine because the teeth could not be numbed in the normal way and because of the

advanced decay of the tooth crowns.  (Cornell Dep. at 28-30; Wylie Decl. Ex. J at 1.) Second, Plaintiff received treatment from dentists on more than one occasion, and all treatments resulted in the Plaintiff's being prescribed antibiotics and pain medications. Antibiotics qualify as a regimen of continuing treatment under the statute. 29 C.F.R. § 825.114(b). See also Caldwell, 208 F.3d at 677 (finding that antibiotic treatments qualify as a regimen of continuing treatment). But see Seidle v. Provident Mut. Life Ins. Co., 871 F. Supp. 238, 244 (E.D. Penn. 1994) (finding that a course of physician-prescribed antibiotics taken at home was not a qualifying regimen under the FMLA).

### c.    Conclusion

In conclusion, taking the facts in the light most favorable to the Plaintiff, Plaintiff has created a question of material fact as to whether he suffered a period of incapacity of more than three days and received qualifying treatment pursuant to 29 C.F.R. § (a)(2)(i).

> **2.    Whether Plaintiff suffered any period of absence to receive multiple treatments (including any period of recovery) by a health care provider for a condition that would likely result in a period of incapacity of more than three consecutive calendar days the absence of medical treatment per 29 C.F.R. § (a)(2)(v)**

In the alternative, Plaintiff argues that if he had not treated his abscessed teeth when he did, he would have been incapacitated for more than three

consecutive days per 29 C.F.R. § 825.114(a)(2)(v).  For support, Plaintiff proffers his own affidavit, and cites the deposition testimony of Doctors Cornell and Buchholz. Dr. Cornell testified and submitted a report stating that if left untreated, Plaintiff's abscesses would have led to a period of incapacity of more than three days, and would have likely resulted in a period of hospitalization.  (Id. at 27, 37; Wylie Decl. Ex. I at 2.) Dr. Buchholz testified that if left untreated, Plaintiff's condition would have "absolutely" resulted in a period of incapacity of more than three days. (Buchholz Dep. at 38.)  According to Plaintiff, this evidence at least creates a fact question regarding whether Plaintiff has satisfied this requirement.

Defendants respond that Plaintiff is not allowed to "bootstrap" additional days of incapacity by claiming a minor condition could have become more severe. For support, Defendants cite cases from other jurisdictions in which courts found it unavailing that a plaintiff's condition could, or did, worsen to the point of being a covered FMLA illness.  These courts hold that for purposes of the FMLA, an employer need only consider the condition at the time of the employee's absence. See Roberts v. Human Dev. Ass'n, 4 F. Supp.2d 154, 162 (E.D.N.Y. 1998) (reasoning that the FMLA does not "appear to support the proposition that the potentiality of a serious health condition can transform what is actually a minor illness into a 'serious health condition'") (citation omitted); Bauer v. Dayton-

Walther Corp., 910 F. Supp. 306, 311 (E.D. Ky. 1996) (finding that plaintiff's

condition "must be taken for what it was during the relevant time period, and not

for what it could have conceivably become"); Seidle, 871 F. Supp. at 246

(reasoning that "to construe the FMLA to include conditions which, although

minor in their initial states, could evolve into serious illnesses would bring within

the protections of the statute virtually every common malady").  In addition,

Defendants argue that the October 21 absence was due to a problem with tooth

number 14, while the November incapacitation was due to the extractions of

three teeth, one of which was number 14. Thus, Plaintiff cannot use the

November incapacity to bootstrap the October 21 absence into something covered

by the FMLA.

     Defendants rely on Merritt v. E. F. Transit, Inc., No. IP 02-0393-C H/K, 2004

WL 503806 (S.D. Ind. March 11, 2004) (unpublished opinion) to support their

position that even if Plaintiff was incapacitated for more than three days in

November, that incapacitation had nothing to do with Plaintiff's October 21

absence. In Merritt, the plaintiff was discharged after missing work in April

because of shoulder pain. Id. at *4. At that time, the plaintiff was under no

physician-imposed restrictions that would have prevented him from working.  Id.

The employer terminated the plaintiff for violating his absenteeism-related

probation. Id.  In July, the plaintiff had rotator cuff surgery. Id. The plaintiff

argued that his July surgery proved that in April he was receiving multiple treatments for a condition that would likely result in a period of incapacity under § 825.114(a)(2)(v). Id. at *5. The court granted the employer's motion for summary judgment because the plaintiff had not received treatment on the April day that he missed work. Id. The court reasoned that an employee who never received multiple treatments cannot qualify for FMLA leave. Id. (citation omitted).

### a.     Whether Plaintiff's dental condition was routine

Although the FMLA specifically states that routine dental conditions are not serious health conditions, medical maladies that are normally minor can be serious health conditions if they meet the statutory requirements. See Rankin v. Seagate Tech., Inc., 246 F.3d 1145, 1147 (8th Cir. 2001). In the instant case, Plaintiff has proffered enough evidence to create a fact issue as to whether his abscessed teeth were serious health conditions. First, the "dental" cases cited by Defendants can all be distinguished because none of the dentists involved in those cases identified the conditions as anything other than "routine," even when the condition was an emergency. Second, as discussed in Part III.A.1.b., supra, Plaintiff has proffered Dr. Cornell's unrebutted testimony that Plaintiff's condition was not routine.

### b.     Whether Plaintiff's condition would likely have

**resulted in more than three days incapacity if left untreated**

The Court finds that Plaintiff has also proffered enough evidence to survive summary judgment on the issue of whether his condition would have resulted in a period of incapacity lasting longer than three days if left untreated. There is no evidence to rebut the testimony of both dentists that an untreated abscess would "absolutely" result in a period of incapacity of more than three days and maybe even would result in hospitalization. There also seems to be no question that surgical extraction was the only viable treatment option in this case. In addition, Plaintiff did seek treatment on October 22, 25, and November 2, 2001.

Although Defendants suggest that Plaintiff's failure to seek treatment on October 21, the day he missed work, is fatal, the Court does not find that this is necessarily so. Plaintiff lives in rural area where it is unlikely that a dentist would be open on Sunday.  Although Plaintiff did not say so directly, he seemed to indicate this in his deposition. When asked if he told Ms. White he was going to seek medical treatment when he left work, Plaintiff answered, "No . . . but it was Sunday." (Davis Dep. at 32.) Neither Party has proffered evidence regarding whether a dentist was available on Sunday, October 21.  In any event, Plaintiff sought dental treatment the next day. Thus, a reasonable jury may excuse Plaintiff's failure to obtain medical treatment on October 21. In addition, Plaintiff

has proffered evidence that arguably ties his October 21 problem with tooth 14 to his November 2 extractions of teeth 14, 15, and 31. Plaintiff avers that the inability to obtain sufficient numbing ties these two events together.  Moreover, Dr. Buchholz's referral to Dr. Cornell asks Dr. Cornell to extract teeth 14, 15, and 31. These are the teeth Dr. Cornell finally extracted. Thus, Plaintiff has created a fact question as to whether his October 21 absence was tied to a dental condition that if left untreated would have resulted in a period of incapacity of more than three consecutive days.

### 3.    Conclusion

In conclusion, Plaintiff has provided enough evidence to survive summary judgment on his interference claims. The Court finds that questions of material fact remain as to whether Plaintiff's dental problem was a serious health condition under the FMLA. Therefore, this part of Defendants' motion is denied.

### B.    Plaintiff's Retaliation Claim

Plaintiff claims that he was terminated for exercising his FMLA rights. It is illegal for an employer to retaliate against an employee for exercising his rights under the FMLA. 29 U.S.C. § 2615(a)(2). The Eighth Circuit uses a variant of the McDonnell-Douglas analysis to analyze FMLA retaliation claims. To establish a prima facie case of retaliation, the employee must show that: (1) he engaged in an

activity that is protected under the FMLA; (2) he suffered an adverse employment action; and (3) there is a causal connection between his action and the adverse employment action. Smith v. Allen Health Sys., Inc., 302 F.3d 827, 832 (8th Cir. 2002). To demonstrate a causal connection, the employee must proffer evidence that gives rise to an inference that a retaliatory motive influenced the decision to terminate him.  Kipp v. Missouri Hw'y & Transp. Comm'n, 280 F. 3d 893, 897 (8th Cir. 2000).  Although generally more of a connection is required, an employee may proffer evidence of temporal proximity between his action and his termination as evidence of a connection between the two.  Smith, 302 F.3d at 832. However, evidence that an employer was concerned about a problem before the employee engaged in the protected activity weakens a temporal argument. Id. at 834.

Once the employer comes forward with a legitimate reason for its decision, the employee must proffer some evidence that the employer's reason is pretextual. Id. at 833.  To demonstrate pretext, the employee must show that the employer's justification was "unworthy of credence." Id. at 833-34.

Plaintiff makes two arguments regarding his retaliation claim. The first is that his termination was temporally connected to his invocation of his FMLA rights. At oral argument, Plaintiff's counsel stated that at the October 29 meeting, Plaintiff's union steward stated that Plaintiff's October 21 absence was due to an

FMLA-related illness, and that Plaintiff was fired only moments after that statement was made.

Plaintiff also argues that his termination based on violation of the LCA was wrongful because the LCA, itself, was "illegitimate."  According to Plaintiff, the LCA was implemented based on Plaintiff's exercising his FMLA rights in April 2001, and thus, the entire basis for his eventual termination was illegal. For support, Plaintiff cites Magistrate Judge Erickson's November 8, 2004 order. In that order, Judge Erickson denied Plaintiff's motion to amend his Complaint to add an FMLA cause of action based on his April 2001 absences. Plaintiff's Amended Complaint would have claimed that Defendants violated the FMLA by "using Plaintiff's taking of leaves [sic] because of serious health conditions on October 21, 2001, and/or from April 27-30, 2001, as negative factors in disciplinary and discharge decisions concerning Plaintiff, contrary to 29 C.F.R. § 825.220(c) and 29 U.S.C. § 2615(a)(1)." (Pl. Prop. Amend. Compl. ¶ 19.) At that time, Plaintiff made the same argument he is now making – that his termination was based on an illegal LCA.  Judge Erickson denied the motion based on futility, but opined that "Plaintiff has adequately alleged, and has produced facts in support of the allegation, that his [April] absence from work . . . was because of a serious health condition, and that Defendants improperly used that absence as a basis for the LCA, which ultimately contributed to his termination." (Doc. No. 32

at 16.)

Defendants argue that Plaintiff cannot use this statement to support his retaliation claim because in examining this issue, Judge Erickson was only looking at whether Plaintiff's claim was colorable under Federal Rule of Civil Procedure 12, not whether Plaintiff had presented a preponderance of evidence under Federal Rule of Civil Procedure 56.

### 1. Prima Facie Case

Plaintiff has proffered enough evidence to make out a prima facie case of retaliation.  Although more evidence would make Plaintiff's claim stronger, the temporal connection between Plaintiff's invocation of the FMLA and his termination cannot be ignored. However, Plaintiff's argument regarding the illegitimacy of the LCA is misplaced. Regardless of what Magistrate Judge Erickson said in his order, the final decision was to deny Plaintiff's motion to amend.  Thus, the only Complaint before the Court says nothing about any April absences or the legitimacy of the LCA.

Plaintiff would like the Court to rely on Judge Erickson's comments to create "material facts supporting Plaintiff's claim [that] the LCA [was] based on a [sic] FMLA protected absence." (Pl. Mem. Opp. Mot. Summ. J. at 34.) However, doing so would amount to amending Plaintiff's Complaint to include the claim

that Magistrate Judge Erickson already found futile. At oral argument, Plaintiff's counsel proffered that "if [Defendants] are using [the LCA] or going to use [the LCA] or intend to use [the LCA] . . . as a defense to the retaliation claim, we get to look behind the LCA and see why it was imposed. . . . If we can show that the triggering event was an FMLA covered absence, . . . we should be able to argue to the Court and to the jury that the LCA is illegitimate." (May 25, 2005 Oral Arg.) In effect, Plaintiff argues that his April absences were wrongly used "as negative factors in disciplinary and discharge decisions," which is the exact claim Judge Erickson refused to allow. The Court will not entertain these arguments. However, since Plaintiff has proffered enough evidence to create a prima facie retaliation case based on his October 21, 2001 absence, the burden now shifts to Defendants to demonstrate that their reason for terminating Plaintiff was not discriminatory.

### 2.    Nondiscriminatory Reason for Plaintiff's Termination

Once an employee has met his initial burden, the employer must proffer evidence of a nondiscriminatory reason for the employment action at issue in the case. McDonnell Douglas v. Green, 411 U.S. 792, 802 (1973). Excessive absenteeism is an acceptable nondiscriminatory reason for termination. Stanback v. Best Diversified Prod., Inc., 180 F.3d 903, 909 (8th Cir. 1999).

Defendants argue that Plaintiff's violation of the LCA was a legitimate reason to terminate Plaintiff.  Plaintiff proffers no evidence to rebut this argument, relying instead on the alleged illegitimacy of the LCA.

Defendants have proffered a legitimate nondiscriminatory reason for Plaintiff's termination. The LCA provided that Plaintiff would have "no absentees of any type other than documented/verified court dates" and "would not report in late or leave early" during the pendency of the LCA. (Davis Dep. at 24.) Plaintiff signed the agreement and testified that he understood what it meant. (<u>Id.</u> at 25.) Thus, Defendants' have articulated a nondiscriminatory reason for Plaintiff's termination.

### 3.    Pretext

Once an employer articulates a nondiscriminatory reason for the employment action, the burden shifts to the employee to "point to some evidence that the employer's proffered reason is pretextual." <u>Smith</u>, 302 F.3d at 833.  To satisfy his burden, Plaintiff must proffer evidence that (1) creates a fact question as to whether the employer's reason was pretextual, and (2) creates a reasonable inference that the employer acted in retaliation for the employee's exercising his legal rights. <u>Id.</u>

In addition to arguing that the LCA is illegitimate, Plaintiff also argues that

he was terminated for exercising his FMLA rights on October 21, 2001 and thus Defendants' stated reason for terminating him was pretextual. Plaintiff's arguments must fail.

In the instant case, Defendants were concerned about Plaintiff's absenteeism long before Plaintiff's October 29, 2001 termination. On September 22, 1999, Plaintiff was given a written warning about his absenteeism. (Davis Dep. at 16.) On January 14, 2001, Plaintiff received another written warning because he had eight unscheduled absences in the preceding twelve months, and was warned that further unscheduled absences would "result in progressive corrective action, which from this stage could be a Last Chance Agreement." (Id. at 18.) Plaintiff signed the LCA on May 15, 2001 knowing that it was being implemented because of his absenteeism. (Id. at 20-21.) Plaintiff's excessive absenteeism was a legitimate non-pretextual reason for terminating Plaintiff. See Stanback, 180 F.3d at 909 (finding that discharge based on violation of company attendance policy was justified).

Moreover, Plaintiff's evidence of a temporal connection between his October 29 invocation of FMLA leave and his firing does not create a fact question on this issue. Plaintiff proffers no other evidence to support this assertion or to show that Defendants' justification for terminating him was not believable. Courts hesitate to find pretext based on temporal relationship alone, and look at temporal

30

proximity in conjunction with other evidence. <u>Sprenger v. Federal Home Loan Bank of Des Moines</u>, 253 F.3d 1106, 1114 (8th Cir. 2001).  Plaintiff proffers no evidence indicating Defendants bore Plaintiff any ill-will because of his health problems or that Defendants wanted to discourage Defendant from taking needed sick leave. In fact, the record shows that Defendants asked for a dentist's note for Plaintiff's absence, seemingly so they could excuse the absence. In addition, Whitbeck gave his approval for Plaintiff to miss work on October 25 when the extractions were originally scheduled.

In this case, where Defendants were concerned about Plaintiff's absenteeism for years, where Plaintiff signed a last chance agreement, and where Plaintiff missed another day of work, the Court finds that Defendants' stated reason for terminating Plaintiff was not pretextual. Since Plaintiff has (1) failed to create a fact question as to whether Defendants' reason for terminating him was pretextual, and (2) failed to create a reasonable inference that Defendants acted in retaliation for Plaintiff's exercising his legal rights, this part of Defendants' motion is granted.

Accordingly, **IT IS HEREBY ORDERED** that Defendants Boise Cascade and Quay Whitbeck's Motion for Summary Judgment [Docket No. 51] is **GRANTED IN PART** and **DENIED IN PART**.  The motion is **GRANTED** as to Plaintiff's

retaliation claims, and **DENIED** as to Plaintiff's interference claims.

Dated: June 3, 2005

s/ Michael J. Davis

Michael J. Davis

United States District Court
